IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **FORD MOTOR COMPANY**, a Delaware corporation, and **FORD GLOBAL TECHNOLOGIES LLC**, a Delaware Limited Liability Company, | Civil Action No. 2:14-cv-13992-GAD-RSW |
| Plaintiffs, | Honorable Gershwin A. Drain |
| v. | |
| **THERMOANALYTICS, INC.**, a Michigan corporation, | |
| Defendants. | |

| | |
|---|---|
| GREGORY D. PHILLIPS (USB 4645) | KARA TERTZAG LIVIDINI (P63009) |
| JARED L. CHERRY (USB 11534) | **FORD MOTOR COMPANY AND** |
| **PHILLIPS RYTHER & WINCHESTER** | **FORD GLOBAL TECHNOLOGIES LLC** |
| 124 South 600 East | 330 Town Center Drive, Suite 800 |
| Salt Lake City, Utah 84102 | Dearborn, MI 48126 |
| Tel:   (801) 935-4935 | Tel:   (313) 323-8559 |
| Fax:   (801) 935-4936 | Fax:   (313) 323-2647 |

Attorneys for Plaintiffs

## FIRST AMENDED COMPLAINT

Plaintiffs Ford Motor Company and Ford Global Technologies, LLC ("FGTL")

(collectively, "Ford") for their First Amended Complaint against defendant ThermoAnalytics,

Inc. ("TAI," "Licensee" or "Defendant") allege as follows:

## **PARTIES**

1.      Ford is a Delaware corporation with its principal place of business in Dearborn,

Michigan.

2.     FGTL is a Delaware limited liability company with its principal place of business in Dearborn, Michigan.

3.     FGTL is a wholly owned subsidiary of Ford Motor Company and is the successor entity to Ford Global Technologies, Inc.

4.     ThermoAnalytics, Inc. is a Michigan corporation with its principal place of business in Calumet, Michigan.

## JURISDICTION AND VENUE

5.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201, and 15 U.S.C. §§ 1119 and 1121(a), in that this case arises under the trademark laws of the United States.

6.     This Court also has supplemental jurisdiction over the counterclaims asserted herein under 28 U.S.C. §1367 because they are related to the claims brought by Ford and form a part of the same case and controversy.

7.     This Court has personal jurisdiction over Defendant based on a forum selection clause included in a license agreement between Ford and Defendant dated December 31, 1998 (the "License Agreement"), a copy of which is attached as Exhibit A.  The License Agreement provides that all actions pertaining to the license agreement "shall be commenced in a state or federal court of competent jurisdiction located in Wayne County, Michigan to whose jurisdiction the parties hereto expressly consent."  Exhibit A, at ¶ 13.4.

8.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1391(c) in that a substantial part of the events giving rise to the claims presented herein occurred in this judicial district and because Defendant is deemed to reside in this judicial district.

## SUBSTANCE OF THE ACTION

9.     This is an action for false designation of origin or sponsorship pursuant to 15 U.S.C. § 1125(a), for cancellation or transfer of federal trademark registration (no. 2,695,172) for RADTHERM pursuant 15 U.S.C. §§ 1064 and 1119, and for related claims relating to the rights of the parties under the License Agreement.

### *Ford Develops RADTHERM Software*

10.     Up through and including the year 1998, Ford invested substantial amounts of time and money to develop a specialized engineering analysis software program named RADTHERM, which was designed to perform complex thermal analysis for modeling the distribution and transfer of heat over complex component systems.

11.     Up through the end of the year 1998, Ford assigned a value to the RADTHERM software of approximately $5,000,000.00.

12.     Up through the end of the year 1998, Defendant provided consulting services to Ford in connection with the development of the RADTHERM software.

13.     At the end of the year 1998, the then-current version of the RADTHERM software was version 4.1.

14.     In exchange for Defendant's services, Ford paid Defendant approximately $800,000.00 prior to execution of the License Agreement for the consulting services provided by Defendant in connection with the development of the RADTHERM software.

15.     On or about May 10, 1996, ThermoAnalytics executed "Software Development Supplemental Terms and Conditions," a copy of which is attached hereto as Exhibit I.

16.     The "Software Development Supplemental Terms and Conditions," provide:

"Any work of authorship created by Seller in performing the services hereunder shall be considered as a specially ordered or commissioned "Work for Hire" and all copyrights

3

for such works of authorship shall belong to Buyer.  In the event any portion of the work of authorship created by Seller in performing the services hereunder does not qualify as "Work For Hire," Seller shall quire title to the copyright for such portion, and assign all acquired title and interest to Buyer."  See Exhibit I, at ¶5.

17.     Subsequent to TAI's execution of the "Software Development Supplemental Terms and Conditions," TAI delivered to Ford version 4.1.1 of the RadTherm Software.

18.     Version 4.1.1. of the RadTherm Software constitutes "Work for Hire," and as such, TAI is obligated to assign all copyrights associated with version 4.1.1 to Ford under the "Software Development Supplemental Terms and Conditions."

19.     Version 4.1.1 of the RadTherm Software includes 385 files in the TM Tools Library.

20.     The TM Tools Library in version 4.1.1 contains 158 files that are identical to files included in version 3.1.0.  A list of the 158 identical files is attached as Exhibit J.

21.     The TM Tools Library set of functions in version 4.1.1 includes 90 unique files that are neither identical to any file in version 3.1.0 nor have the same file name as any file in version 3.1.0.  A list of the 90 unique files in the TM Tools Library set of functions in version 4.1.1 is attached as Exhibit K.

22.     The 90 files listed in Exhibit K were created by TAI in performing the services under the Software Development Supplemental Terms and Conditions.

23.     The 90 files listed in Exhibit K constitute "Work for Hire" under the "Software Development Supplemental Terms and Conditions" executed by TAI.

24.     The remaining 137 files in version 4.1.1 of the TM Tools Library have file names that are the same as files in the TM Tools Library, but that have different content.  A list of the 139 files is attached as Exhibit L.

25.     The 137 files listed in Exhibit L were created by TAI in performing the services

4

under the Software Development Supplement Terms and Conditions.

26.    On June 8, 2015, TAI asserted that the TM Tools Library in version 4.1.1 of the RadTherm Software "is copyrighted by ThermoAnalytics and remains the property of ThermoAnalytics."

27.    Prior to June 8, 2015, TAI did not provide to Ford any written notice asserting that the TM Tools Library in version 4.1.1 is copyrighted by ThermoAnalytics and remains the property of ThermoAnalytics."

### *Ford Licenses Defendant to Commercialize the RADTHERM Software and to use the RADTHERM Trademark for that Purpose*

28.    Under the License Agreement, Defendant received a license from Ford to use the trademark RADTHERM in connection with the sale of the RADTHERM software.  Defendant also received the exclusive right to commercialize the RADTHERM software as a software product to be jointly owned by Ford and Defendant.

29.    Pursuant to the terms of the License Agreement, Ford and Defendant developed, utilized, and sold the RADTHERM software commercially for a period of fifteen (15) years.

30.    For at least a period of 15 years, Defendant has used its relationship with Ford to promote the sale of the RADTHERM Software.  For example, Defendant's website states: "Ford pioneered the development of RadTherm and uses it extensively in heat management design and analysis."  A copy of the "Our Customers" page, from which the foregoing quotation was taken, is attached hereto as Exhibit B.

### *For more than 15 years Defendant Represents to Ford and Public that the RADTHERM Software is Jointly Owned by Ford and TAI.*

31.     The License Agreement requires that Defendant "shall cause FGT[L]'s copyright notice to appear on all copies of FGT[L] Licensed Software Sold under this Agreement." Exhibit A, at ¶ 8.1.

32.     Version 5.0 of the RADTHERM software included the following "splash screen" that includes FGTL's copyright notice, as required by Paragraph 8.1 of the License Agreement.



33.     Version 9.3.1 of the RADTHERM software included the following "splash screen" that includes FGTL's copyright notice, as required by Paragraph 8.1 of the License Agreement.



34.     Version 10.0.2 of the RADTHERM software included the following "splash screen" that includes FGTL's copyright notice, as required by Paragraph 8.1 of the License

6

Agreement.



35.     The "About RadTherm" information included in the commercial version of the RADTHERM software released in 2013, includes FGTL's copyright notice, as required by Paragraph 8.1 of the License Agreement, as shown in the following screen capture.



36.     On information and belief, Ford alleges that each of versions 6.0, 7.0, and 8.0 included FGTL's copyright notice, as required by Paragraph 8.1 of the License Agreement.

37.     The End User License Agreement associated with version 6.0 of the

7

RADTHERM Software, states:

> ***RadTherm which accompanies this license (the "Software") is the property of Ford Global Technologies, Inc. ("FGTI") and ThermoAnalytics, Inc. ("ThermoAnalytics")*** and is protected by copyright law. While FGTI and ThermoAnalytics continue to own the Software, you will have certain limited rights to use the Software after your acceptance of this license.

38.     A copy of the End User License Agreement associated with version 6.0 of the RADTHERM Software is attached hereto as Exhibit M.

39.     On March 21, 2012, TAI executed a First Amendment to License Agreement, a copy of which is attached hereto as Exhibit N.

40.     The First Amendment to License Agreement provides: "Except as specifically modified or amended by the terms of this AMENDMENT, the LICENSE AGREEMENT and all provisions contained therein are, and shall continue, in full force and effect and are hereby ratified and confirmed."  Exhibit N, at page 2…

### Ford Makes Substantial Investments in New Features to be included in the RADTHERM Software after execution of the License Agreement

41.     On at least two occasions after execution of the License Agreement, Ford paid TAI to develop new features to be included in upcoming versions of the RADTHERM Software.

42.     On or about June 29, 2000, TAI submitted to Ford a quotation for the "Addition of Climate Control Features into RadTherm."  A true and correct copy of the quote and related documents are attached hereto as Exhibit O.

43.     The quotations reflect a price of $40,000.00 for the "Addition of Climate Control Features into RadTherm."  Exhibit O, at page 1.

44.     The "Climate Control Features" paid for by Ford were "incorporated into RadTherm 5.1."  See Exhibit O, at page 6.

45.     On or about February 22, 2001, TAI submitted a quotation for software

development services for a "Natural Convection Stratified Flow Solver." A true and correct copy of the quotation and related documents are attached hereto as Exhibit P.

46.     The quotations reflect a price of $135,000.00 for the development of the "Natural Convection Stratified Flow Solver."

47.     The "Natural Convection Stratified Flow Solver" was to be implemented in version 7.0 of the RADTHERM Software. See Exhibit P, at page 3.

48.     The development of the "Natural Convection Stratified Flow Solver" was never completed, and the only deliverable from the project produced by TAI was a written report.

### *Defendant "Leverages" Ford's RADTHERM Software to Create MuSES with the Cooperation of Ford*

49.     In August 1998, Keith Johnson, the president of TAI, presented a paper at the GTMV98 conference titled: *MuSES: A New Heat and Signature Management Design Tool for Virtual Prototyping* (the "GTMV98 Paper"). A copy of the GTMV98 paper is attached as Exhibit C.

50.     In the GTMV98 Paper, Mr. Johnson explains that a software program titled MuSES is "patterned after Ford Motor Company's RadTherm" Software. Specifically, the GTMV98 Paper states:

> MuSES is patterned after Ford Motor Company's RadTherm, a rapid prototyping thermal design tool. Thermal models can be rapidly constructed in RadTherm from commonly available geometric and material descriptions. This work has been accomplished in part under a Cooperative Research and Development Agreements (CRADA) between TACOM and Ford with ThermoAnalytics as the primary developer.

Exhibit C, at page 2.

51.     The GTMV98 Paper further explains that "MuSES incorporates rapid prototyping techniques developed for commercial automotive applications…." See Exhibit C, at page 2

9

(emphasis added). The "incorporation" of RadTherm into MuSES is also shown in Figure 1 of

Mr. Johnson's paper, which is reproduced below.



Figure 1. ThermoAnalytics Complementary Programs Provide a Leveraged Advantage for MuSES.

52.     The GTMV98 Paper repeatedly states that the RADTHERM Software provides "a

Leveraged Advantage for Muses." Exhibit C, at Figure 1, page 1, and page 2.

53.     The GMTV98 Paper explains that the "leverage" enjoyed by MuSES comes from

the RADTHERM Software. Specifically, the GMTV98 Paper explains:

> In developing MuSES, ThermoAnalytics is leveraging on experience gained from past
> and on-going thermal model development programs. The complementary attributes of
> these products are illustrated in Figure 1. *Primarily, MuSES is patterned after Ford
> Motor Company's RadTherm, a rapid prototyping thermal design tool.* Thermal models
> can be rapidly constructed in RadTherm from commonly available geometric and
> material descriptions.

### *Defendant Offers Software For Sale Under the RADTHERM Mark without Disclosing Such Software to Ford and Without Payment of Royalties on Such Sales*

54.     The License Agreement provides: "Licensee shall be limited to using the Marks

exclusively to advertise and promote FGTI Licensed Software." See Exhibit A, at ¶ 12.

55.     The License Agreement further provides: "Licensee shall pay a Royalty to FGTI

for each Sale of each copy of FGTI Licensed Software, Licensee Licensed Software and Jointly

Owned Software at a rate that is 10% of the Reference Price for the corresponding Sales charged

to Customers by Licensee….”  See Exhibit A, at ¶ 4.2.

56.    In spite of the prohibition on use of the Marks for any software other than FGTI License Software, Defendant began offering for sale a product using the RADTHERM mark under the name RADTHERM IR.

57.    Defendant has never paid royalties based on sales of software sold under the name RADTHERM IR.

58.    Defendant never provided notice to Ford of its sale of the RADTHERM IR Software.

59.    Defendant never obtained Ford’s consent to use the RADTHERM mark in connection with its sale of the RADTHERM IR Software.

### *Defendant Terminates the License Agreement and Claims Ownership of the RADTHERM Software and the RADTHERM Trademark*

60.    On November 14, 2013, Defendant provided a notice of termination of the License Agreement (the “Termination Notice), which was to be effective on March 1, 2014.  A copy of the Termination Notice is attached hereto as Exhibit D.

61.    On February 28, 2014, counsel for Ford wrote to Defendant regarding various obligations imposed on Defendant upon termination of the License Agreement, including cessation of use of the RADTHERM trademark, delivery of source code for the RADTHERM software, and assignment of Ford’s “undivided one-half interest in all copyrights to the joint works” created under the License Agreement.  A copy of the letter dated February 28, 2014, is attached hereto as Exhibit E.

62.    On March 4, 2014, counsel for TAI wrote to counsel for Ford and asserted that the “new” RADTHERM software—in spite of continuing use of the RADTHERM name—is *not*

11

covered by the License Agreement.  A copy of the letter dated March 4, 2014, is attached hereto

as Exhibit F.  Specifically, counsel for TAI asserted:

> As TAI's notice explains, [the] old RadTherm software developed sixteen years ago was
> replaced by new source code TAI developed in conjunction with the U.S. Army. The new
> software, also referred to as RadTherm, is jointly owned by TAI and the U.S. Army.

  Exhibit F, at page 2.

63.     Prior to November 14, 2013, TAI did not provide to Ford any written

correspondence claiming that Ford had no ownership interest in version 5.0 of the RadTherm

Software.

### *Defendant's Claims of Ownership of the RADTHERM Software*
### *and the RADTHERM Trademark Violate the Terms of the License Agreement*

64.     The License Agreement expressly precludes any transfer of rights by Defendant

to any third party to the RADTHERM Software without prior written consent by Ford.

Specifically, the License Agreement provides:

> Licensee agrees that it will not assign any of its rights granted herein with respect to [or]
> in the FGT[L] Licensed Software, Licensee Licensed Software, or Jointly Owned
> Software to a party other than FGT[L] without obtaining written permission from FGT[L]
> prior to such assignment.

  Exhibit A, at ¶ 8.1.

65.     Defendant's transfer of ownership rights of the RADTHERM Software to the

U.S. Army—if such a transfer actually occurred—would constitute a violation of paragraph 8.1

of the License Agreement.

66.     Representatives from Ford and TAI met in person in Dearborn, Michigan on April

11, 2014, to discuss the obligations of the parties under the License Agreement.

67.     On April 17, 2014, counsel for TAI wrote to counsel for Ford and provided a

summary of the points discussed by the parties during the in-person meeting.  A copy of the

letter dated April 17, 2014, is attached hereto as Exhibit G.

68.     TAI's letter of April 17, 2014, asserts:

3. At [the in person meeting] meeting, Keith [Johnson] provided an overview of how ThermoAnalytics developed a new thermal solver, funded by the U.S. Army. The new software, known as MUSES, carries government ITAR restrictions. MUSES is marketed by ThermoAnalytics for non-military use under the RadTherm name, as that name is familiar to the OEMs.  MUSES, which was not a derivative work, supplanted RadTherm.

4. ThermoAnalytics requested FGTL's acknowledgment that it claims no ownership rights to software developed after RadTherm 4.1.

 Exhibit G, at page 2.

69.     The assertions quoted in the foregoing paragraph regarding the relationship between MuSES and RADTHERM are contradicted by the GTMV98 Paper published by Mr. Johnson because the GTMV98 Paper repeatedly describes how MuSES "leverages" the RADTHERM software and "incorporates" the "rapid prototyping techniques developed for commercial automotive applications…."  Exhibit C, at Figure 1, page 1, and page 2.

70.     Defendant's contention that Ford has "no ownership rights to software developed after RadTherm 4.1" is expressly contradicted by the "About RadTherm" information displayed in the current commercial version, namely version 11.0.0, of the RADTHERM Software, which indicates that the copyright for the RADTHERM Software is jointly owned by Defendant and by Ford.

71.     Defendant's contention that Ford has "no ownership rights to software developed after RadTherm 4.1" is expressly contradicted by the terms of the License Agreement. Specifically, the License Agreement provides:

[A]ll works of authorship created or derivative works created with respect to Jointly Owned Software [i.e., the RADTHERM Software] under this Agreement shall be deemed 'joint works' under the Copyright Act and that all copyrights for such works of authorship shall jointly belong to FGT[L] and Licensee….Upon completion of each new release of Jointly Owned Software or upon termination by either FGT[L] or Licensee, as

13

such events occur, the Parties each hereby assign their respective individual rights, title and interest in copyrights in the joint works then existing to FGT[L] and Licensee as joint owners. FGT[L] and Licensee shall each own an undivided one-half interest in all copyrights to the joint works then existing….

Exhibit A, at ¶ 8.1.

72.     Defendant's contention that Ford has "no ownership rights to software developed after RadTherm 4.1" is contradicted by performance under the License Agreement for a period of at least fifteen (15) years, during which time Defendant never communicated that Ford's rights in the RADTHERM software ended after version 4.1.

73.     Defendant's license to use the RADTHERM mark is expressly limited to software covered by the License Agreement.  Specifically, the License Agreement provides:

> All trademarks and trade names identifying FGT[L] Licensed Software or FGT[L] or Ford businesses (the "Marks") are, and will remain the exclusive property of FGT[L] and Ford respectively. Licensee shall not take any action that jeopardizes the marks, and acquires no rights in the Marks except in the limited use rights specified below. Licensee shall be limited to using the Marks exclusively to advertise and promote FGT[L] Licensed Software.

Exhibit A, at ¶ 12.

74.     Defendant's contention that Ford has "no ownership rights to software developed after RadTherm 4.1" is contradicted by Defendant's continuing use of the RADTHERM mark to identify its software up through and including version 11.0.0 of the RADTHERM Software.

### *Defendant Refuses to Comply with the Requirements of the License Agreement Governing Termination*

75.     The License Agreement provides: "the obligation to pay Royalties to FGT[L] shall survive until Licensee ceases to market, Sell, and support the FGT[L] Licensed Software, Licensee Licensed Software or Jointly Owned Software."  Exhibit A, at ¶ 11.1.

76.     In spite of the above-quoted requirement that payment of Royalties continue following termination of the License Agreement, Defendant refuses to pay royalties after March

14

1, 2014.  Specifically, counsel for Defendant asserted:

> ThermoAnalytics will pay royalties up through March 1, 2014, and that will conclude all royalty obligations.

Exhibit G, at page 2.

77.    Defendant's refusal to pay royalties after March 1, 2014, violates Defendant's obligation to pay royalties "until Licensee ceases to market, Sell, and support the FGT[L] Licensed Software, Licensee Licensed Software or Jointly Owned Software."  License Agreement, at ¶ 11.1.

78.    The License Agreement provides that upon termination of the License Agreement, Defendant is obligated to "return to FGT[L] all copies of and information related to FGT[L] Licensed Software, and Jointly Owned Software that were furnished to or prepared by Licensee in connection with the rights Licensed under this agreement." Exhibit A, at ¶ 11.1.

79.    Ford has expressly requested that Defendant "provide source code and object code for all of the joint works now existing, including the most recent version of the RadTherm software."  Exhibit E, at page 2.

80.    Although not explicitly stated, counsel for Defendant's reference to the alleged "ITAR restrictions" is presumably the rationale for Defendant's failure and refusal to provide to Ford the materials required by the License Agreement.

81.    In spite of the above-quoted requirement set forth in the License Agreement, Defendant has failed and refused to provide source code and object code for the RadTherm software. Specifically, counsel for Defendant asserted: "[t]he new software, known as MUSES, carries government ITAR [International Traffic in Arms Regulations] restrictions."  Exhibit E, at page 2.

82.    The License Agreement provides that upon termination, Defendant's right to use

15

the RADTHERM mark terminates.  Specifically, the License Agreement provides that:

> Ford businesses (the "Marks") are, and will remain the exclusive property of FGT[L] and Ford respectively. Licensee shall not take any action that jeopardizes the marks, and acquires no rights in the Marks except in the limited use rights specified below.  ***Licensee shall be limited to using the Marks exclusively to advertise and promote FGT[L] Licensed Software.***

Exhibit A, at ¶ 12.

83.     In spite of the above-quoted requirement and Ford's written demand that Defendant cease all use of the RADTHERM trademark, Defendant continues to use the RADTHERM trademark.  Exhibit F, at page 2 ("Ford requires that TAI cease all use of the RadTherm trademark.")  Attached hereto as Exhibit H is a page from TAI's website showing prominent use of the RADTHERM trademark on September 11, 2014.

84.     The License Agreement provides that upon termination, the parties are obligated to assign all rights in the joint works then existing to Ford and Defendant as joint owners. Specifically, the License Agreement provides:

> Upon completion of each new release of Jointly Owned Software or upon termination by either FGT[L] or Licensee, as such events occur, the Parties each hereby assign their respective individual rights, title and interest in copyrights in the joint works then existing to FGT[L] and Licensee as joint owners. FGT[L] and Licensee shall each own an undivided one-half interest in all copyrights to the joint works then existing…."

 Exhibit A, at ¶ 8.1.

85.     In spite of the above-quoted requirement and Ford's written request for assignment of "all individual rights, title, and interest in copyrights in the joint works," Defendant has failed and refused to comply.

### *Defendant Violated the License Agreement by Failing to Pay Royalties Due to Ford*

86.     The License Agreement provides that: "Licensee shall pay a Royalty to FGTI for each Sale of FGTI Licensed Software, Licensee Licensed Software and Jointly Owned Software

16

which are included as part of consulting services or the development of third party <u>software</u> <u>modules which operate in conjunction with any portion of FGTI Licensed Software</u>, Licensee Licensed Software and Jointly Owned Software…"  See Exhibit A, at ¶4.2.

87.     Defendant created a "Human Module" that operates in conjunction with the RADTHERM Software.

88.     Defendant created a "Battery Module" that operates in conjunction with the RADTHERM Software.

89.     Defendant created an "Advanced Solver" that operates in conjunction with the RADTHERM Software.

90.     Defendant created a "CAE Coupling" module that operates in conjunction with the RADTHERM Software.

91.     In spite of the obligation to pay a royalty to Ford in connection with sales of "software modules which operate in conjunction with [the] FGTI Licensed Software," Defendant has failed to pay royalties on sales of the "Human Module," the "Battery Module," the "Advanced Solver," and the "CAE Coupling" module.

92.     Ford is entitled to recover from Defendant royalties owned on sales of the "Human Module," the "Battery Module," the "Advanced Solver," and the "CAE Coupling" module.

**FIRST CLAIM FOR RELIEF**
(FALSE DESIGNATION OF ORIGIN OR SPONSORSHIP UNDER 15 U.S.C. § 1125(a))

93.     Ford realleges and incorporates herein the allegations above.

94.     At all times following the execution of the License Agreement, Defendant was obligated to apply the RADTHERM mark solely to software jointly owned by Ford and

Defendant.

95.     Defendant has utilized the RADTHERM mark in connection with the RADTHERM IR Software without Ford's knowledge or consent.

96.     Following the termination of the License Agreement, Defendant has continued to use the RADTHERM mark in connection with Defendant's products and services.

97.     Defendant's use of the RADTHERM mark prior to the termination of the License Agreement in connection with the RADTHERM IR Software is likely to confuse, mislead or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation of Defendant's RADTHERM IR Software, and is likely to cause such people to believe in error that Defendant's RADTHERM IR Software products and services have been authorized, sponsored, approved, endorsed, or licensed by Ford.

98.     Defendant's use of the RADTHERM mark after termination of the License Agreement is likely to confuse, mislead or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation of Defendant's services and products, and is likely to cause such people to believe in error that Defendant's products and services have been authorized, sponsored, approved, endorsed, or licensed by Ford or that Defendant is in some way affiliated with Ford.

99.     Defendant's acts constitute false or misleading descriptions, false advertising, and false designations of the origin and/or sponsorship of Defendant's goods in violation of Section 43(a) of the Lanham Act, as amended, 15 U.S.C. § 1125(a).

100.    By reason of Defendant's actions, Ford has suffered irreparable harm.  Unless Defendant is restrained from its actions, Ford will continue to be irreparably harmed.

101.    Ford has no remedy at law that will compensate for the continued and irreparable

18

harm that will be caused if Defendant's acts are allowed to continue.

102.    As a direct and proximate result of Defendant's conduct, Ford is entitled to damages, treble damages, statutory damages, and the equitable remedy of an accounting for, and a disgorgement of, all revenues and/or profits wrongfully derived by Defendant from its false designations of origins, and Ford's attorneys' fees and costs pursuant to 15 U.S.C. § 1117.

## SECOND CLAIM FOR RELIEF
### (CANCELLATION OF TRADEMARK REGISTRATION PURSUANT TO 15 U.S.C. § 1064)

103.    Ford realleges and incorporates herein the allegations above.

104.    At all times following the execution of the License Agreement, the RADTHERM mark has been applied solely to software jointly owned by Ford and Defendant.

105.    Following the termination of the License Agreement, Defendant has continued to use the RADTHERM mark in connection with Defendant's products and services.

106.    Defendant's use of the RADTHERM mark is likely to confuse, mislead or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation of Defendant's services and products, and is likely to cause such people to believe in error that Defendant's products and services continue to be authorized, sponsored, approved, endorsed, or licensed by Ford.

107.    Defendant's continued use of the RADTHERM mark misrepresents the source of Defendant's goods and services in connection with which the RADTHERM mark is used.

108.    By reason of Defendant's actions, Trademark Registration No. 2,695,172 for RADTHERM should be cancelled.

## THIRD CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

109.    Ford realleges and incorporates herein the allegations above.

19

110.    Defendant has breached its obligations under the License Agreement to continue to pay royalties due to Ford following termination.

111.    Defendant has breached its obligations under the License Agreement by continuing to use the RADTHERM trademark following termination.  See Exhibit A, at ¶ 12 (requiring that the RADTHERM mark be used only in connection with software offered under the License Agreement).

112.    Defendant has breached its obligations under the License Agreement by refusing to "return to FGT[L] all copies of and information related to FGT[L] Licensed Software, and Jointly Owned Software that were furnished to or prepared by Licensee in connection with the rights Licensed under this agreement." Exhibit A, at ¶ 11.1.

113.    Defendant has breached its obligations under the License Agreement by refusing to assign its "individual rights, title and interest in copyrights in the joint works then existing to FGT[L] and Licensee as joint owners."  Exhibit A, at ¶ 8.1.

114.    Defendant has breached its obligations under the License Agreement by failing to pay royalties on sales of software modules "which operate in conjunction with any portion of FGTI Licensed Software," as required by the License Agreement.

115.    Defendant breached its obligations under the License Agreement by failing to pay roytalies on sales of software sold under the name RADTHERM IR.

116.    As a direct and proximate result of Defendant's conduct, Ford has suffered damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
(ESTOPPEL)

117.    Ford realleges and incorporates herein the allegations above.

118. TAI contends that changes to the RADTHERM Software that occurred prior to February 2000 terminated Ford's ownership interest in the RADTHERM Software.

119. TAI waited until November 14, 2013, to communicate to Ford in writing its contention that Ford's ownership interest in the RADTHERM Software was allegedly terminated in February 2000.

120. TAI waiting until June 8, 2015, to communicate to Ford in writing its contention that the TM Tools Library of version 4.1.1 of the RADTHERM Software "is copyrighted by ThermoAnalytics and remains the property of ThermoAnalytics."

121. In spite of TAI's contentions that Ford holds no copyright interest in version 5.0 of the RADTHERM Software, TAI included a copyright notice identifying FGTL as the copyright owner on version 5.0 of the RADTHERM Software.

122. In spite of TAI's contentions that Ford holds no copyright interest in versions 6.0-11.0 of the RADTHERM Software, TAI included copyright notices in each version identifying FGTL on each of versions 5.0-11.0 of the RADTHERM Software.

123. In spite of TAI's contentions that Ford holds no ownership interest in version 6.0 of the RADTHERM Software, TAI included an end user license agreement with version 6.0 of the RADTHERM Software expressly stating that the RADTHERM Software "is the property of Ford Global Technologies, Inc. ("FGTI") and ThermoAnalytics, Inc."

124. In spite of TAI's contentions, on March 22, 2012, TAI expressly "ratified and confirmed" all provisions of the License Agreement. See Exhibit N, at page 2.

125. In reliance on Defendant's representations, Ford permitted TAI to continue to use the RADTHERM Trademark.

126. In reliance on Defendant's representations, Ford entered into contracts to pay TAI

at least $175,000.00 to add new features to the RADTHERM Software.  See Exhibits O and P.

127.    In view of Defendant's delay in asserting its alleged ownership rights the RADTHERM Software, witnesses with potentially relevant information to Defendant's claim are no longer available.

128.    In view of Defendant's delay in asserting its alleged ownership rights the RADTHERM Software, information relevant information to Defendant's claim is no longer available.

129.    In view of Defendant's delay in asserting its alleged ownership rights the RADTHERM Software and Ford's reliance on Defendant's representations relating to the License Agreement, it would be inequitable to permit Defendant to retain ownership of the RADTHERM Software.

## FIFTH CLAIM FOR RELIEF
(DECLARATORY JUDGMENT OF OWNERSHIP OF RADTHERM SOFTWARE)

130.    Ford realleges and incorporates herein the allegations above.

131.    An actual and justiciable controversy exists between the parties as to the ownership of the RADTHERM Software.

132.    Defendant contends that it owns all copyrights to Versions 5.0-11.0 of the RADTHERM Software.

133.    Ford contends that Defendant and Ford jointly own all copyrights to Versions 5.0-11.0 of the RADTHERM Software.

134.    Defendant contends that it owns all copyrights to the TM Tools Library of version 4.1.1 of the RADTHERM Software.

135.    Ford is entitled to a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 that

Defendant and Ford jointly own all copyrights to Versions 5.0-11.0 of the RADTHERM Software.

136.   Ford is further entitled to a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 that Ford owns all copyrights to the TM Tools Library of version 4.1.1 of the RADTHERM Software.

137.   Ford is further entitled to a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 that Defendant's claims of ownership are barred under 17 U.S.C. § 507.

**PRAYER FOR RELIEF**

WHEREFORE, Ford prays for relief against Defendant as follows:

1.   That a permanent injunction be issued enjoining Defendant, its employees, agents, successors and assigns, and all those in active concert and participation with Defendant, and each of them who receives notice directly or otherwise of such injunctions, from:

(a)   imitating, copying, or making unauthorized use of the RADTHERM mark, or any confusingly similar variations thereof;

(b)   importing, manufacturing, producing, distributing, circulating, selling, offering for sale, advertising, promoting or displaying any service or product using any simulation, reproduction, counterfeit, copy, or any confusingly similar variation of the RADTHERM mark;

(c)   using any simulation, reproduction, counterfeit, copy or confusingly similar variation of the RADTHERM mark in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any service or product;

(d)   using any false designation of origin or false description (including, without limitation, any letters or symbols constituting the RADTHERM mark, or performing any act,

which can, or is likely to lead members of the trade or public to believe that any service or product manufactured, distributed or sold by Defendant is in any manner associated or connected with Ford, or is sold, manufactured, licensed, sponsored, approved or authorized by Ford;

(e) transferring, consigning, selling, shipping or otherwise moving any goods, packaging or other materials in Defendant's possession, custody or control bearing a design or mark substantially similar to the RADTHERM mark;

(f) engaging in any other activity constituting unfair competition with Ford with respect to the RADTHERM mark; and

(g) instructing, assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (f) above.

2. For an order directing that Defendant file with the Court and serve upon Ford's counsel within thirty (30) days after entry of such judgment, a report in writing under oath, setting forth in detail the manner and form in which Defendant has complied with the above.

3. For an order permitting Ford or auditors for Ford to audit and inspect the books and records of Defendants for a period of six months after entry of final relief in this matter to determine the scope of Defendants' past use of the RADTHERM trademark, including all revenues and sales related to Defendants' use of the RADTHERM trademark, as well as Defendants' compliance with orders of this Court.

4. For an order permitting auditors for Ford to audit and inspect the books and records of Defendants for a period of six months after entry of final relief in this matter for the purpose of auditing all royalties payable under the License Agreement pursuant to Paragraph 13.2 of the License Agreement.

5. For the entry of judgment declaring that Defendant has used a false designation of

24

origin under the Lanham Act, 15 U.S.C. § 1125(a).

6.     For an order requiring Defendant to assign its individual rights, title and interest in all copyrights in the RADTHERM Software to Ford and TAI as joint owners.

7.     For an order requiring Defendant to deliver all information related to the RADTHERM software, including all source code and object code, that were prepared by Defendant in connection with the rights granted under the License Agreement.

8.     For an order requiring Defendant to pay royalties to Ford until Defendant ceases to market, sell, and support the RADTHERM Software.

9.     For an award of damages, treble damages, statutory damages, and the equitable remedy of an accounting for, and a disgorgement of, all revenues and/or profits wrongfully derived by Defendant from its false designations of origins, and Ford's attorneys' fees and costs pursuant to 15 U.S.C. § 1117.

10.    For an award of Ford's costs and disbursements incurred in this action, including Ford's reasonable attorneys' fees.

11.    For an award of all royalties due under the License Agreement an wrongfully withheld by Defendant.

12.    For an order transferring ownership of federal trademark registration (no. 2,695,172) to Ford, or in the alternative, for an order cancelling federal trademark registration (no. 2,695,172).

13.    For a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 that that Defendant and Ford jointly own all copyrights to Versions 5.0-11.0 of the RADTHERM Software.

14.    For a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 that Ford owns all copyrights to the TM Tools Library of version 4.1.1 of the RADTHERM Software.

25

15.     For a declaratory judgment pursuant to 28 U.S.C. §§ 2201 that Defendant's claims of ownership of the RADTHERM Software and the TM Tools Library of version 4.1.1 of the RADTHERM Software are barred under 17 U.S.C. § 507.

16.     For an award of all actual damages caused by the acts of Defendant forming the basis of this Complaint.

17.     For an award of interest, including prejudgment interest on the foregoing sums.

18.     For such other and further relief as the Court may deem just and proper

DATED this 14th day of August, 2015.

> Gregory D. Phillips
> Jared L. Cherry
> PHILLIPS, RYTHER & WINCHESTER
>
>
> By:     /s/ Gregory D. Phillips
> Gregory D. Phillips
> *Attorneys for Plaintiff Ford Motor Company*