UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR CO., and FORD GLOBAL TECHNOLOGIES, LLC,

Plaintiffs,

v.

THERMOANALYTICS, INC.,

Defendant.

Case No. 14-cv-13992

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
R. STEVEN WHALEN

/

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [25]**

**I. INTRODUCTION**

Ford Motor Company and Ford Global Technologies, LLC ("Plaintiffs"), commenced this action on October 16, 2014 against ThermoAnalytics, Inc. ("Defendant"). *See* Dkt. No. 1. On August 14, 2015, Plaintiffs filed an Amended Complaint adding no new parties. *See* Dkt. No. 30. In the Amended Complaint, Plaintiffs contend that Defendant is liable for: (I) False Designation of Origin under 15 U.S.C. § 1125(a); (II) Breach of Contract; (III) Promissory Estoppel; and request (IV) Declaratory Judgment on the RadTherm Software. *See id.*

On July 29, 2015, Plaintiffs filed a Motion for Partial Summary Judgment on both the False Designation of Origin claim and Breach of Contract. *See* Dkt. No. 25. For the reasons discussed herein, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment.

**II. BACKGROUND**

Beginning in 1994, Ford began collaboration with Michigan Technological University ("MTU") to help develop a specialized computer-aided engineering program named

"RadTherm." Dkt. No. 25 at 11, Pg. ID No. 277. RadTherm was designed to model the distribution and transfer of heat over complex systems, such as automobiles. *Id.* Over the course of about two years, Ford paid over $300,000 toward the development of RadTherm. At that point, the latest version of the software was "RadTherm 3.0." *Id.* at Pg. ID No. 278.

In 1996, Defendant ThermoAnalytics began operations and, according to Defendant, acquired MTU's intellectual property for the RadTherm software. Dkt. No. 33 at 5, Pg. ID No. 610. Ford paid ThermoAnalytics for the development of RadTherm under the terms of a Software Development agreement through most of 1998. Dkt. No. 25 at Pg. ID No. 278. Ford claims that the Software Development was a "Work for Hire" contract that granted them ownership of whatever ThermoAnalytics produced. *Id.*; *see also* Dkt. No. 19-1 at 21, Pg. ID No. 137. This arrangement lasted until the end of 1998, and brought the software to Version 4.1.1. *Id.*

At the end of 1998, Ford and ThermoAnalytics entered into a License Agreement ("the Agreement"). Dkt. No. 33 at Pg. ID No. 610. Under the terms of the Agreement, Defendant would have an exclusive license to develop and commercialize the existing "FGTI Licensed Software." *Id.* The Agreement defined FGTI Licensed Software as "RadTherm" and "Fluid Flow."[1] *Id.* In return, Defendant would pay royalties to Plaintiffs. The Agreement further provided at Section 4.3:

> As further consideration for the License granted herein, [ThermoAnalytics] hereby assigns and agrees to assign to FGTI all copyrights [ThermoAnalytics] acquires in original works of authorship included in additions, enhancements and improvements [ThermoAnalytics] is authorized to make as Derivative Works to FGTI Licensed Software, and to assign to FGTI and [ThermoAnalytics] jointly all copyrights [ThermoAnalytics] acquires in original works of authorship included in additions, enhancements, and improvements in Jointly Owned Software, but excluding such original works by [ThermoAnalytics] that form portions of Licensee Licensed Software.

Dkt. No. 25 at Pg. ID No. 304. The Agreement further provided:

---

[1] The parties are not disputing any rights or terms regarding "Fluid Flow."

> FGTI represents and [ThermoAnalytics] acknowledges that title to FGTI Licensed Software, and all copies made in connection with this Agreement or Derivatives Works created based on FGTI Licensed Software shall belong to FGTI and that FGTI. . . shall have ownership of all copyright, trade secret, patent, trademark and other intellectual or industrial property rights therein or associated therewith.

*Id.* at Pg. ID No. 306. The Agreement also included a post-termination clause which required ThermoAnalytics to "deliver source code and object code for joint works," and to pay royalties to FGTI until ThermoAnalytics ceased "to market, Sell, and support the FGTI Licensed Software, Licensee Licensed Software or Jointly Owned Software." Additionally, the Agreement provided a "Trademark Notice" clause at Section 12:

> All trademarks and trade names identifying FGTI Licensed Software or FGTI or Ford businesses are, and will remain the exclusive property of FGTI and Ford respectively. [ThermoAnalytics] shall not take any action that jeopardizes the Marks, and acquires no rights in the Marks except in the limited use rights specified below. [ThermoAnalytics] shall be limited to using the Marks exclusively to advertise and promote FGTI Licensed Software."

*Id.* at Pg. ID No. 311.

In the year 2000, Defendant released "RadTherm 5.0." Dkt. No. 33 at Pg. ID. No. 638. Defendant claims that this version of RadTherm "was an entirely new software product and **not** a derivative of RadTherm 4.1.1, and it was **not** the licensed software under the License Agreement." *Id.* According to ThermoAnalytics, RadTherm 5.0 was a modified version of software called MuSES, created under programs with the United States Army. *Id.* at Pg. ID No. 638–639. ThermoAnalytics claims that RadTherm 5.0 rendered prior versions of RadTherm obsolete. *Id.* at Pg. ID No. 639. ThermoAnalytics further claims that all subsequent versions of RadTherm starting in 2000 were derived from the MuSES source code, and not the RadTherm 4.1.1 source code that was subject to the Licensing Agreement. *Id.* Despite these updates however, the new software retained the name RadTherm. ThermoAnalytics maintains that they

discussed the change "openly with Ford" in 2000. *Id.* Ford disputes this. Dkt. No. 25 at Pg. ID No. 284.

In 2012, the Agreement was amended to Ford Global's change in name and address. Those were the only changes made to the Agreement. The First Amendment stated:

> Except as specifically modified or amended by the terms of this AMENDMENT, the LICENSE AGREEMENT and all provisions contained therein are, and shall continue, in full force and effect and are hereby ratified and confirmed.

Dkt. No. 25-10 at Pg. ID No. 387. The document was signed by both parties. *Id.*

Ford claims they were not aware of any software changes until they received a letter from ThermoAnalytics in November of 2013 claiming that their ownership interest in RadTherm was terminated. *Id.* ThermoAnalytics, in response, has pointed to an email exchange between the two parties, where ThermoAnalytics denied Ford's request for source code updates because the software was different and subject to specific "restrictions." Dkt. No. 33 at Pg. ID No. 683.

Despite allegedly changing the software completely and retaining the original name, ThermoAnalytics still partially performed under the Licensing Agreement. Although ThermoAnalytics has not provided the RadTherm source code since 2000, they continued to pay royalties to Ford over an additional 13 years. Dkt. No. 25 at Pg. ID No. 284.

In November of 2013, the Defendant sent the Plaintiffs a Termination Notice, effective March 1, 2014. *Id.* The last royalty was paid to Plaintiffs in March of 2014. ThermoAnalytics has still not provided any source code to the new versions of RadTherm (now called TAITherm). *Id.*

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) empowers the Court to render summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the Court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a


party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the Court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a

jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

## IV. DISCUSSION

### A. False Designation of Origin

Trademarks are typically protected by the Lanham Act. 15 U.S.C. § 1125. A trademark is "any word, name, symbol, or device, or any combination thereof used by a person to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (quotations omitted). Under the Lanham Act, a plaintiff will have a claim for false designation of origin if a defendant uses a trademark in a way that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person . . ." 15 U.S. C. § 1125(a)(1)(A). Where the use of a trademark has been licensed to a licensee, "use by a licensee which is outside the scope of the license is both trademark infringement and a breach of contract. And continued use by an ex-licensee after the license has been terminated is an act of trademark infringement." 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:30 (4th ed. 2015).

Plaintiffs allege in their Motion that the Defendant exceeded the scope of the Licensing Agreement in its use of the RADTHERM trademark. Dkt. No. 25 at Pg. ID No. 300. Plaintiffs argue that the terms of the Agreement demonstrate Plaintiffs' ownership of the mark, as well as the limited scope of Defendant's license to use the mark. Plaintiffs assert that the Agreement required Defendant to "cease all use of the RadTherm trademark" upon the Agreement's

termination. *Id.* But despite the termination of the Agreement, and a written demand to cease use of the mark, Defendant continued its use.

Defendant concedes that it continued to use the mark, RADTHERM, until April of 2015, a couple of years after Defendant terminated the Agreement. Dkt. No. 33 at Pg. ID No. 628. However, Defendant argues that Plaintiffs never had a proprietary interest in the mark at all. *Id.* Defendant argues that its use of the mark prior to the Agreement, as well as its registration of the mark with the United States Patent and Trademark Office in 2002—years after the Agreement was executed—without any objection from Plaintiffs, demonstrate that Defendant alone has sole ownership of the mark. *Id.* Defendant further argues that the Agreement did not assign any trademark rights to Plaintiffs because the language of the contract does not refer to the RADTHERM trademark. *Id.* at Pg. ID No. 629–630. Defendant also asserts that if there was an assignment, the assignment would be invalid as an improper "naked assignment" of a mark without its goodwill. *Id*.

> a. The Language of the Agreement Assigned the RADTHERM Trademark to Plaintiffs

Trademarks are property that can be bought, sold and licensed. 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:1 (4th ed. 2015). An assignment of a mark "is an outright sale of all rights in that mark." McCarthy § 18:15. "[A]fter a valid assignment, the assignee acquires all of the legal advantages of the mark that the assignor enjoyed, including prior use." *Id.*

Defendant argues that the Agreement did not make any assignment to Plaintiffs, and at most, "confirms Ford's ownership of its then-existing intellectual property rights." Dkt. No. 33 at Pg. ID No. 629. But that argument is not persuasive.

The language of the Agreement is plain. Section 12, the "Trademark Notices" of the Agreement, in relevant part states, "[a]**ll trademarks and trade names identifying FGTI Licensed Software** or FGTI or Ford business (the "Marks") are, and will remain the exclusive property of FGTI and Ford respectively." Dkt. No. 25-1 at 10, Pg. ID No. 311 (emphasis added). In Exhibit 1 of the Agreement, "RadTherm" is listed as "FGTI Licensed Software." *Id.* at Pg. ID No. 315. Section 8.1, titled "Ownership of Software," states that "FGTI, or its licensees or assigns shall have ownership of all copyright, trade secret, patent, **trademark and other intellectual or industrial property rights** therein or associated [with FGTI Licensed Software]." *Id.* at Pg. ID No. 306 (emphasis added). When Section 12, Section 8 and Exhibit 1 are read together, it appears the text of the Agreement clearly grants ownership of the RADTHERM mark to Plaintiffs. *Laborers Pension Trust Fund-Detroit and Vicinity v. Interior Exterior Specialists Co.*, 824 F. Supp. 2d 764, 770 (E.D. Mich. 2011) ("if the language is 'clear and unambiguous,' the Court need look no further") (citing *Haywood v. Fowler,* 190 Mich. App. 253, 475 N.W.2d 458, 461 (1991)).

Defendant's alternative argument, that the assignment is an invalid "naked assignment," is similarly undercut by the language of the Agreement. Defendant correctly states that an assignment of a trademark without its goodwill is not valid. *Liquid Glass Enterprises, Inc. v. Liquid Glass Indus. of Canada, Ltd.*, 1989 WL 222653 at *4 (E.D. Mich. 1989). However, their argument is puzzling given that Section 8 granted Ford all "other intellectual or industrial property rights." Dkt. No. 25-1 at Pg. ID No. 306. Although it is not clear from their brief, ThermoAnalytics apparently is pointing to the fact that the Agreement does not expressly grant goodwill along with the trademark. However, while goodwill may not be explicitly spelled out within the terms of the Agreement, it is certainly captured impliedly by the broad property grant

of Section 8. *See Ferrellgas Partners, L.P. v. Barrow*, 2005 WL 1736276 at *4 (11th Cir. 2005) ("Where the entire stock of a business is purchased and the business continued under its original name, it must be presumed that the purchaser acquired the goodwill of the business together with the commercial symbols of that goodwill, the business' trademarks and trade names."); *see also Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Products, Inc.*, 75 F.2d 13, 15 (5th Cir. 1935) ("[Trademarks] attach to and pass with the good will of a business, and, as appurtenant to it, they are freely and easily sold. No particular form of words is necessary to transfer them; they inhere in and pass with good will."); *see also* McCarthy § 18:37.

Accordingly, the language of the Agreement created a valid assignment of the RADTHERM trademark to Plaintiffs. Therefore, whether Plaintiffs had ownership rights in the mark prior to the Agreement is no longer a relevant question, and any arguments regarding original ownership and prior use of the mark are moot. Upon the execution of the Agreement, the mark was assigned to Plaintiffs and licensed back to Defendant.

> b. *ThermoAnalytics Infringed on the Trademark by Exceeding the Scope of the Licensing Agreement*

"The Lanham Act creates a private cause of action to protect trademarks and trade dress where there is a likelihood of confusion between the defendant's mark and the plaintiff's protected mark." *Innovation Ventures, LLC v. N2G Distributing, Inc.*, 763 F.3d 524, 534 (6th Cir. 2014); *see also* 15 U.S.C. § 1125(a). Typically, where an ex-licensee continues to use the licensed trademark, the continued use by itself creates a likelihood of confusion under the Lanham Act. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997) ("We . . . hold that proof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish "likelihood of confusion."); *see also Sunsport Inc. v. Barclay Leisure Ltd.*, 984 F. Supp. 418, 422 (E.D. Va.

1997) ("As a former licensee who continues to use the licensor's mark, Sunsport has to overcome the presumption that it has infringed.") (citing *Burger King Corp. v. Mason,* 710 F.2d 1480 (11th Cir. 1983)).

Here, Defendant terminated the License Agreement on March 1, 2014. Dkt. No. 25 at Pg. ID No. 284. Section 11.1 of the Agreement, "Effects of Termination," states "the obligation to pay Royalties to FGTI shall survive until Licensee ceases to market, sell, and support the FGTI Licensed Software, Licensee Licensed Software or Jointly Owned Software." However, despite sending its last royalty payment in March of 2014 and being given a written demand to cease use of the Trademark in February of 2014, Dkt. No. 25-13 at 1, Pg. ID No. 390, Defendant continued to use the RADTHERM mark until April of 2015. Dkt. No. 33 at Pg. ID No. 638. In fact, during oral argument, Plaintiffs revealed to the Court that, despite "officially" changing the name of the software to TAITHERM, Defendant still uses the original name, RADTHERM, as a reference for its newly branded software on Defendant's website.[2] It's even used in the URL. Therefore, Plaintiffs have provided clear and substantial evidence of unauthorized use to establish liability. Defendant has brought no evidence or defense sufficient to raise a genuine issue of material fact as to liability. Accordingly, the Court will grant Plaintiffs' Motion with regard to this Count.

### B. Breach of Contract

Plaintiffs have also moved for Summary Judgment on their Breach of Contract claim. Their argument focuses primarily on the payment of royalties and the status of their ownership rights to the source code of the latter versions of RadTherm.

---

[2] The website can be found at: http://www.thermoanalytics.com/products/taitherm-radtherm

> a. *The Language of the Contract Requires that the New Software be a Derivative Work in Order for Copyrights to be Captured by the Agreement*

According to the Agreement, ThermoAnalytics was required to pay royalties on the marketed software and turn over source code within thirty days of every release of a new version of the FGTI Licensed Software. Dkt. No. 25-1 at Pg. ID No. 304. Further, in Section 4.3, ThermoAnalytics agreed to assign to Plaintiffs:

> [A]ll copyrights Licensee acquires in original works of authorship included in additions, enhancements and improvements Licensee is authorized to make as Derivative Works to FGTI Licensed Software, and to assign to FGTI and Licensee jointly all copyrights Licensee acquires in original works of authorship included in additions, enhancements, and improvements in Jointly Owned Software, but excluding such original works by Licensee that form portions of Licensee Licensed Software.

*Id.* (emphasis added).   Additionally, in Section 11.1, upon termination of the Agreement, ThermoAnalytics agreed to "assign copyrights, grant licenses to inventions, [and] deliver source code and object code for **joint works**," (emphasis added) as well as to continue to pay royalties for as long as ThermoAnalytics continued to "market, sell, and support . . . Jointly Owned Software." *Id.* at Pg. ID No. 311.

The Agreement also provides definitions for many of these terms:

1. <u>Jointly Owned Software</u>: defined by the Agreement as being "FGTI and Licensee owned software and derivative works based thereon or compilations thereof described in Exhibit I hereto."[3] *Id.* at Pg. ID 303.

2. <u>Derivative Works</u>: defined by the Agreement as "a work of authorship based on one or more preexisting works including, without limitation, a translation, condensation, transformation, expansion or adaptation, which, if prepared without authorization of the

---

[3] As stated above, RadTherm is listed as FGTI Licensed Software. Dkt. No. 25-1 at Pg. ID No. 315.

owner of the copyright of such preexisting work, would constitute a copyright infringement." *Id.*

3. <u>Joint Works</u>: defined by the Agreement as being "**all works of authorship created or derivative works created with respect to Jointly Owned Software under this Agreement**." *Id.* at Pg. ID No. 307 (emphasis added).

With these definitions in mind, it appears Defendant was required to 1) assign the copyrights and 2) continually turn over the source code for every new version of RadTherm[4] and any derivative works, as well as 3) pay royalties for as long as the software was marketed by the Defendant.

i. The New Software is a Joint Work

Neither party disputes that RadTherm 4.1.1 ("the Original Software") is subject to the Agreement. Whether the latter versions of RadTherm ("the Disputed Software") are subject to the Agreement is the issue before the Court.

Defendant claims that the software they marketed starting in 2000 was not similar to the original RadTherm programs, but was instead an original work of authorship that did not constitute a "derivative work." If the new software is not a derivative work and is truly different, the argument follows, then it would fall outside of the parameters set by Sections 4.3 and 11.1. However, this argument mischaracterizes the scope of the Agreement.

As stated above, under the Agreement:

> The Parties agree that all works of authorship created **or** derivative works created with respect to Jointly Owned Software under this Agreement shall be deemed "joint works" under the Copyright Act and that all copyrights for such works of authorship shall jointly belong to FGTI and Licensee . . .

Dkt. No. 30-1 at Pg. ID No. 530 (emphasis added). While Defendant has addressed the definition of derivative works, Defendant's argument essentially reads out all of the language that precedes

---

[4] Or at least the code that is captured by the agreement.

it. Under Michigan law, "contracts must be construed as a whole: if reasonably possible, all parts and every word should be considered; no part should be eliminated or stricken by another part unless absolutely necessary." *Workmon v. Publishers Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997).

The word "or" signals to the Court that there is a difference between "works of authorship" and "derivative works." The Court finds that the Agreement extends to "all derivative works created with respect to Jointly Owned Software" (e.g. the Original Software) **and** "all works of authorship created with respect to Jointly Owned Software." Therefore, the Agreement covers the Disputed Software if it was created with respect to the Original Software.

Despite Defendant's contention that the Disputed Software was wholly original, the evidence points to the contrary. At oral argument, Defendant's counsel stated the inspiration for the Disputed Software was the Original Software. The Disputed Software served the same function as the Original Software. Dkt. No. 33-2 at Pg. ID No. 639 ("The software that was the subject of the License Agreement was made obsolete with the release of RadTherm 5.0."). Defendant held out the Disputed Software as being a new and improved version of the Original Software for over a decade. Dkt. No. 30 at Pg. ID No. 504. Defendant even represented to the general public that the Disputed Software was owned by Plaintiffs. *Id*. Finally, in 2012, Defendant re-affirmed the Agreement when it signed the Amendment, confirming that Sections 4.3 and 11.1 of the Agreement still applied to the Disputed Software.

Defendant has brought evidence demonstrating that the Disputed Software was not derivative. But Defendant has not brought evidence demonstrating that the Disputed Software was created without respect to the Original Software. Accordingly, the Court finds that the Disputed Software is covered by the Agreement as a joint work.

        ii.   The Defendant breached the Contract

As stated above, Section 11.1 clearly states that upon termination of the Agreement, Defendant is to "assign copyrights, grant licenses to inventions, [and] deliver source code and object code for joint works." Dkt. No. 30-1 at Pg. ID No. 534. The Court has found that the Disputed Software is a joint work, but Defendant has neither provided the source code, nor assigned the relevant copyrights. Therefore, the Defendant has breached the contract.

       b.   *ThermoAnalytics Breached the Contract when it Infringed on the Trademark*

The primary focus of Plaintiffs' brief with regard to this Count is the status of the source code to the latter versions of RadTherm. However, Defendant's counterargument to this claim leads inexorably to an alternate breach of contract.

Defendant argues that the Disputed Software, being of almost entirely new/original source code, is not subject to the contract because it is not a derivative work, and therefore they did not breach when they ceased the payment of royalties and refused to turn over the source code. *See* Dkt. No. 33 at Pg. ID No.614–626. Even if Defendant's interpretation of the contract is true, it doesn't explain why Defendant continued to use the mark, RADTHERM, on the new software. Despite contending that they had stopped marketing the relevant code near the turn of the century, the Defendant used the RADTHERM mark continuously until April 2015.[5] Section 12 of the Agreement states, "Licensee shall be limited to using the Marks **exclusively** to advertise and promote FGTI Licensed Software." Dkt. No. 25-1 at Pg. ID No. 311 (emphasis added). It has already been determined that "the Marks" include the name, RADTHERM. Thus, accepting Defendant's argument also requires accepting the fact that Defendant used the RADTHERM trademark beyond the limitations provided in the Agreement. Accordingly, even

---

[5] As stated above, ThermoAnalytics is currently still using the name RadTherm on their website. The website can be retrieved at: http://www.thermoanalytics.com/products/taitherm-radtherm

-15-

taking Defendant's counterarguments as true, the Defendant has breached for an additional reason.

## V. CONCLUSION

For the reasons discussed herein, the Court **GRANTS** the Motion for Partial Summary Judgment.

IT IS SO ORDERED.

Dated: October 28, 2015                                   s/Gershwin A. Drain  
Detroit, MI                                               HON. GERSHWIN A. DRAIN  
                                                                 United States District Court Judge